# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
### CLARKSBURG

**UNITED STATES OF AMERICA**
                    **Plaintiff,**

**v.**                                             **Case No. 1:16-CR-31**
                                             **(JUDGE KEELEY)**

**ERIC SCOTT BARKER, aka "Skateboard," aka "Skate,"**
**RANDALL LEE BARKER, and**
**MEGAN EILEEN DUNIGAN,**
                    **Defendants.**

## <u>REPORT AND RECOMMENDATION THAT DEFENDANT'S MOTION TO DISMISS BE GRANTED</u>

This matter is before the undersigned pursuant to Defendant Eric Barker's Motion to Dismiss filed on September 18, 2016 (ECF No. 83). Co-Defendants Randall Barker (ECF No. 87) and Megan Dunigan (ECF No. 84) subsequently joined in that motion. United States District Judge Irene M. Keeley referred the pending motion to the undersigned for a Report and Recommendation on September 23, 2016 (ECF No. 89). The Government filed a Response in Opposition on September 26, 2016 (ECF No. 91). On November 9, 2016, came parties for a hearing on the Motion – the Government, by counsel Andrew Cogar, Assistant United States Attorney; Defendant Eric Barker, in person and by counsel, Brian Kornbrath; Defendant Randall Barker, in person and by counsel, George Cosenza; Defendant Megan Dunigan, in person and by counsel, Charles Berry. Following the motion hearing, the undersigned ordered the parties to supplement their briefs (ECF No. 115). Defendant Eric Barker filed a supplemental brief on November 15, 2016 (ECF No. 119). The Government filed a supplemental brief on November

16, 2016 (ECF No. 128). Considering all of the parties' briefs and oral argument on the matter, the undersigned provides the following report and recommendation that Defendant's Motion to Dismiss be granted for the reasons set forth below.

## I. Factual background

The Indictment charges all three Defendants with Conspiracy to Distribute and Possession with Intent to Distribute MAM-2201[1] (Count One), Maintaining a Drug Involved Premises (Count Two), all between April 2014 and April 2016, and six counts of Distribution of the Controlled Substance Analogue MAM-2201 on or about February 17, 2016 (Counts Five through Eleven) (ECF No. 2).  The Indictment also charges Defendants Eric Barker and Randall Barker with two additional counts of Distribution of the Controlled Substance Analogue MAM-2201 in August 2015 (Counts Three and Four). Id. The Indictment included a Forfeiture Allegation pursuant to 21 U.S.C. § 853, upon obtaining a conviction, for $22,408.00 and a money judgment of at least $150,000.00. Id.

## II. Defendant's Motion to Dismiss

Defendant Eric Barker filed a Motion to Dismiss all Counts of the Indictment on September 18, 2016 (ECF No. 83). The motion was joined by Megan Dunigan on September 21, 2016 (ECF No. 84), and by Randall Barker on September 23, 2016 (ECF No. 87). In his motion, Eric Barker argued that the Analogue Act was void for vagueness, both facially and as applied to MAM-2201, and prosecution under the Act violated due process (ECF No. 83).

More specifically, Defendant argues that statute lacks sufficient definiteness, as the term "substantially similar" is undefined, and there is no agreed upon method for determining

---

[1] [1-(5-fluoropentyl-)-1H-indol-3-yl](4-methylnapthalen-1-yl)methanone. MAM-2201 is not a controlled substance; so these Counts of the Indictment were in violation of 21 U.S.C. § 802(32)(A), not of the Controlled Substance Act.

substantial similarity in the relevant scientific field. Id. at 4. Defendant also argues that the statute provides inadequate notice because, although the government maintains and publishes a list of controlled substances under the Controlled Substance Act ("CSA"), there is no such list of analogues. Id. at 8. The public therefore has no means by which to readily determine whether a particular substance is an analogue. Id. As a result of these defects, the statute also invites arbitrary and discriminatory enforcement. Id. at 9. Lastly, Defendant joins the Tenth Circuit's concerns voiced in United States v. Makkar, 810 F.3d. 1139 (10th Cir. 2015) regarding the Analogue Act in light of Johnson v. United States, 135 S.Ct. 2551 (2015).

### III. Government's Response to Defendant's Motion to Dismiss

The Government argues as to notice that, regardless of any vagueness with respect to the term "substantially similar," Defendant has no excuse because "anyone with internet access has had either constructive or actual notice of both the chemical properties and legal status of MAM2201" (ECF. No. 91 at 4). Citing United States v. Klecker, 348 F.3d 69, 72 (4th Cir. 2003), the Government argues that substantial similarity of MAM-2201 to a scheduled controlled substance is a question of fact for a jury. Id. at 5. Lastly, the Government argues that the scienter requirement alleviates any vagueness concerns under United States v. McFadden, 135 S. Ct. 2298, 2307 (2015). Id. at 6.

### IV. Defendant's Supplemental Brief

On November 15, 2016, Defendant Eric Barker filed a Supplemental Brief containing internal DEA communications that show the DEA had determined MAM-2201 to be substantially similar in chemical (physical) structure to two schedule I controlled substances (JWH-018 and 2C-B) as early as April 6, 2012 (ECF No. 119 at 11). Those communications also note that "the pharmacological effects are still under evaluation" (Id. at 13). In addition, the

communications also identify an internal list of analogues maintained by the DEA's Office of Diversion Control, Drug and Chemical Evaluation Section (ODE). Id at 14.

## V. Government's Supplemental Brief

In its supplemental brief filed on November 16, 2015, the Government identified undisputed facts, including that "the Government is not aware of any initiation of federal scheduling procedures (temporary or otherwise) for the substance [MAM-2201]" (ECF No. 128 at 1). The Government observes that "Some states, however, have already scheduled MAM-2201," and that "the Attorney General (through DEA) has initiated temporary scheduling for other synthetic cannabinoids." Id. at 1-2. The Government further argued:

> Nothing in the Analogue Act imposes any time limits or scheduling-related conditions to determine the illegality of controlled substance analogues, and no court or statute has suggested otherwise. Accordingly, the failure to schedule a known controlled substance analogue has no bearing on the criminality of the analogue . . . the Act's constitutionality is not dependent on whether the substance at issue is temporarily scheduled. The only conceivable constitutional question associated with the Analogue Act is whether it is void under the Fifth Amendment for vagueness.

Id. at 3. The Government further argued, in essence, that the issue before the Court had been resolved by Klecker and McFadden, and that Johnson v. United States has no bearing on this case. Id.

## VI. Discussion

The Government urges the undersigned to declare the matter resolved by our precedent in Klecker and by McFadden. Because this case presents an issue of first impression warranting full and thoughtful consideration, the undersigned must decline the invitation.

As this recommended holding is based on separate grounds – statutory interpretation – not addressed in either McFadden or Klecker, the undersigned believes it to be unconstrained by prior precedent. Because facial challenges are appropriate when a statute implicates First

4

Amendment rights, this review is limited to an as-applied challenge. United States v. Mazurie, 419 U.S. 544. 95 S.Ct. 710, 42 L.Ed.2d 706 (2010). See also Klecker, citing United States v. Sun, 278 F.3d 302, 309 (4th Cir. 2002). The nature of the analysis, however, first requires a review of the history of the relevant legislation.

## 1. Legislative History

In 1970, Congress enacted the Controlled Substances Act (hereinafter "CSA"); the controlled substances scheme is located in Title 21, Chapter 13, and comprised of Subchapter 1, Parts A through F. 21 U.S.C. § 801 et. seq. Part B, "Authority to Control; Standards and Schedules," categorized controlled substances into five schedules (I – V) according to various criteria pertaining to its potential for medical use or recreational abuse. 21 U.S.C. § 812.  Part B also authorized the Attorney General to add or remove substances from the schedules, or to move a substance to a different schedule, upon compliance with specified procedures. 21 U.S.C. § 811(a). Compliance with those procedures, however, took some time and effort:

> First, the Attorney General must request a scientific and medical evaluation from the Secretary of Health and Human Services (HHS), together with a recommendation as to whether the substance should be controlled. A substance cannot be scheduled if the Secretary recommends against it. § 201(b), 21 U.S.C. § 811(b). Second, the Attorney General must consider eight factors with respect to the substance, including its potential for abuse, scientific evidence of its pharmacological effect, its psychic or physiological dependence liability, and whether the substance is an immediate precursor of a substance already controlled. § 201(c), 21 U.S.C. § 811(c). Third, the Attorney General must comply with the notice-and-hearing provisions of the Administrative Procedure Act (APA), 5 U.S.C. §§ 551-559, which permit comment by interested parties. § 201(a), 21 U.S.C. § 811(a). In addition, the Act permits any aggrieved person to challenge the scheduling of a substance by the Attorney General in a court of appeals. § 507, 21 U.S.C. § 877.
>
> It takes time to comply with these procedural requirements. From the time when law enforcement officials identify a dangerous new drug, it typically takes 6 to 12 months to add it to one of the schedules. S.Rep. No. 98-225, p. 264 (1984), U.S.Code Cong. & Admin.News 1984, p. 3182. Drug traffickers were able to take advantage of this time gap

by designing drugs that were similar in pharmacological effect to scheduled substances but differed slightly in chemical composition, so that existing schedules did not apply to them. These "designer drugs" were developed and widely marketed long before the Government was able to schedule them and initiate prosecutions. See *ibid.*

<u>Touby v. United States</u>, 500 U.S. 160, 162, 111 S.Ct. 1752, 1754, 114 L.Ed.2d 219

(1991). As a result of the "designer drug" time lag, the CSA was amended in 1984 adding §

811(h) to give the Attorney General temporary scheduling authority on an emergency basis - as

"necessary to avoid an imminent hazard to the public safety." 21 U.S.C. § 811(h). The

abbreviated procedures for temporary scheduling allowed the Government to respond more

quickly to emerging designer drugs:

> Temporary scheduling under § 201(h) allows the Attorney General to bypass, for a limited time, several of the requirements for permanent scheduling. The Attorney General need consider only three of the eight factors required for permanent scheduling. § 201(h)(3), 21 U.S.C. § 811(h)(3). Rather than comply with the APA notice-and-hearing provisions, the Attorney General need provide only a 30-day notice of the proposed scheduling in the Federal Register. § 201(h)(1), 21 U.S.C. § 811(h)(1). Notice also must be transmitted to the Secretary of HHS, but the Secretary's prior approval of a proposed scheduling order is not required. See § 201(h)(4), 21 U.S.C. § 811(h)(4). Finally, § 201(h)(6), 21 U.S.C. § 811(h)(6), provides that an order to schedule a substance temporarily "is not subject to judicial review."
> Because it has fewer procedural requirements, temporary scheduling enables the Government to respond more quickly to the threat posed by dangerous new drugs. A temporary scheduling order can be issued 30 days after a new drug is identified, and the order remains valid for one year. During this 1-year period, the Attorney General presumably will initiate the permanent scheduling process, in which case the temporary scheduling order remains valid for an additional six months. § 201(h)(2), 21 U.S.C. § 811(h)(2).

<u>Touby</u>, 500 U.S. at 163. Subsequently, the Attorney General delegated temporary

scheduling authority to the Drug Enforcement Agency (DEA). 28 CFR § 0.100(b). In <u>Touby</u>, the

Supreme Court upheld the constitutionality of the Attorney General's delegation of scheduling

power to the DEA. 500 U.S. 160 (1991).

At this point, prosecutions for the manufacture, distribution, or possession of a scheduled controlled substance were covered under the CSA, and a temporary scheduling order permitted prosecutions for a substance for which scheduling procedures had been initiated. But because a temporary scheduling order could not take effect until the thirty-day notice period had expired, there remained a thirty-day window of time from identification to control, during which prosecutions remained unauthorized by even the abbreviated temporary scheduling procedures enacted in § 811(h).

Shortly thereafter, the Controlled Substance Analogue Enforcement Act of 1986 ("Analogue Act") was enacted. 100 Stat. 3207, Subtitle E. The Act accomplished two things – first, it defined an analogue by inserting Paragraph 32 into the existing definitions of 18 U.S.C. § 802 contained in Part A ("Definitions").[2] 21 U.S.C. § 802(32). Second, it provided penalties by

---

[2] 21 U.S.C. 802(32)(A): Except as provided in subparagraph (C), the term "controlled substance analogue" means a substance—

(i) the chemical structure of which is substantially similar to the chemical structure of a controlled substance in schedule I or II;

(ii) which has a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II; or

(iii) with respect to a particular person, which such person represents or intends to have a stimulant, depressant, or hallucinogenic effect on the central nervous system that is substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect on the central nervous system of a controlled substance in schedule I or II.

(B) The designation of gamma butyrolactone or any other chemical as a listed chemical pursuant to paragraph (34) or (35) does not preclude a finding pursuant to subparagraph (A) of this paragraph that the chemical is a controlled substance analogue.

(C) Such term does not include—

(i) a controlled substance;

(ii) any substance for which there is an approved new drug application;

(iii) with respect to a particular person any substance, if an exemption is in effect for investigational use, for that person, under section 355 of this title to the extent conduct with respect to such substance is pursuant to such exemption; or

(iv) any substance to the extent not intended for human consumption before such an exemption takes effect with respect to that substance.

adding § 813 to Part B, specifying that a "controlled substance analogue shall, to the extent intended for human consumption, be treated for the purposes of any Federal law as a controlled substance in schedule I." 18 U.S.C. § 813. Notably, the Analogue Act made no further additions to the CSA pertaining to procedures; no separate regulatory scheme or procedural treatment for analogues was created, leaving only those already in place for scheduling controlled substances.

At the outset, it is unnecessary to base this holding on arguments or precedent as to either the constitutional sufficiency of "substantially similar" or scienter, as it appears this case can clearly be resolved in advance of that point by the statutory framework itself and congressional intent. Arguments regarding notice are therefore addressed narrowly, and only as they pertain to timing.

## 2. Statutory Interpretation and Congressional Intent

The legislative history of the Analogue Act has been reviewed and statutory interpretation undertaken in a number of cases pertaining to whether the required elements should be read in the conjunctive or the subjunctive. See United States v. Fedida, 942 F. Supp.2d 1270 (M.D. Fla. 2013) (reviewing statutory interpretation cases). However, this report and recommendation undertakes statutory interpretation specifically as to what the CSA and Analogue Act require of the DEA procedurally for analogues. It is this issue that appears primarily dispositive, well before it is necessary to reach the parties' primary arguments as to constitutionality.

An inquiry as to the requirements of a statute begins first with construction of the statute, and then inference of the intent of Congress. Liparota v. United States, 471 U.S. 419, 423, 105 S.Ct. 2084, 2087, 85 L.Ed.2d 434 (1985). "The starting point for any issue of statutory interpretation is the language of the statute itself." United States v. Weaver, 659 F.3d 353 (4th

Cir. 2011). Absent a clearly expressed legislative intention to the contrary, the language of a statute is to be given its plain and ordinary meaning. Id. at 356. See also Consumer Product Safety Commission et al. v. GTE Sylvania, Inc. et al.,447 U.S. 102 (1980).

The Analogue Act was not enacted as standalone legislation, but rather inserted new definitions and penalties into the existing framework of the CSA in Subchapter 1. Conspicuously, the Analogue Act did *not* provide any separate scheme for procedural requirements regarding analogues. Therefore, the key issue is whether the procedural requirements of the CSA and of Subchapter 1 as a whole also apply to analogues.

Whole statute interpretation instructs that portions of a statute should be interpreted in light of the whole, and not as a distinct entity divorced from the statute in which it is embedded. See Davis v. Michigan Dept. of Treasury, 489 U.S. 803, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) (rejecting interpretation that failed to read clause "in its context within the overall statutory scheme"). Case law specific to the statutes in question instructs that various parts of Subpart 1 – which encompass the CSA, the Analogue Act, and other related Acts – likewise instructs that they be interpreted as such.

In United States v. Spain, the Tenth Circuit's conclusion that the section inserted into the CSA authorizing temporary scheduling, § 811(h), was "a different and separate addition to the Act with a new purpose and procedure," was overruled by the Supreme Court in Touby, as recognized in United States v. Raymer, 1991 WL 86884, 16 n.6 (10th Cir. 1991). Likewise, the provisions of sections of Subpart 1 enacted at different times "do not operate in conflict with each other; rather, the latter continues the statutory scheme of the former." United States v. Sloan, 2016 WL 6989768, *4 - *6, No. 4:14CR152 (E.D. Mo. 2016) (observing Supreme Court

directives to interpret a statute "as a symmetrical and coherent regulatory scheme" and "fit, if possible, all parts into an harmonious whole" (internal citations omitted)).

The Supreme Court in <u>McFadden v. United States</u> interpreted the CSA in precisely that manner: "In addressing the treatment of controlled substance analogues under federal law, one must look to the CSA." 135 S.Ct. 2298, 2300, 192 L.Ed.2d 260 (2015). ". . . [T]he Analogue Act extends that framework [in the CSA from controlled substances] to analogous substances." <u>Id</u>. at 2301. Here, like 811(h), the Analogue Act inserted 811§32 and §813 into the CSA, and it is clear that they should likewise be interpreted together with the whole framework of the CSA.

That much being resolved, the analysis must next turn to whether Congress intended for the scheduling requirements of the CSA to apply to analogues, or they intended none at all – those being the only two possibilities presented by the statutory framework. Congress is never presumed to make sweeping policy changes in a vague or unclear manner; changes to well-settled law require clear intent. <u>United States v. Langley</u>, 62 F.3d 602, 605 (4th Cir. 1995). "Such a major change in the existing rules would not likely have been made without specific provision in the text of the statute (citation omitted)." <u>United Savings Association of Texas v. Timbers of Inwood Forest Associates, LTD</u>, 484 U.S. 365, 380, 108 S.Ct. 626, 635, 98 L.Ed.2d 740 (1988). Dispensing with procedural requirements for scheduling a substance that allegedly poses a threat to public safety would undisputably be a sweeping policy change and a vast departure from the clearly laid out and very specific procedures theretofore followed under the CSA. A reading of the CSA as a whole cannot fairly support the proposition that no procedural requirements whatsoever should apply to analogues; these interpretations support only the conclusion that the overall statutory scheme applies to analogues as well.

"[I]f the statutory language is unambiguous and the statutory scheme is coherent and consistent, our analysis ordinarily terminates, and there is no cause to examine the legislative history." United States v. Wilder, 120 F.3d 468, 469-70 (4th Cir. 1997), cert. denied, 522 U.S. 1092 (1998). Therefore, the undersigned does not believe a review of congressional intent is necessary to reach this conclusion. However, even if it was, there is no evidence of Congressional intent to dispense with *all* procedural requirements for scheduling for analogues. In fact, statements of congressional intent made in support of the Analogue Act's passage are beyond clear as to the opposite intent:

> Senator Strom Thurmond introduced the Senate bill that would become the Analogue Act. See 131 Cong. Rec. 19,411. The bill was intended to make illegal "chemical substances—so called 'designer drugs'—which are not *currently* covered by the Controlled Substances Act." Id. (emphasis added)
> In the House, Representative Dan Lungren, the bill's sponsor, remarked that the intent of the bill was to close a loophole in the federal drug laws—"the time lag between the production of these new designer drugs *and their subsequent control under the Controlled Substances Act*." 131 Cong. Rec. 18,938; see also 131 Cong. Rec. 19,114–15 (statement of Sen. Hawkins) ("[A]s we have discovered, as fast as the Government outlaws designer drugs, the chemists can synthesize new ones."); 131 Cong. Rec. 27,311 (statement of Sen. D'Amato, noting that the bill "closes the loophole in *present* law that allows the creation and distribution of deadly *new* drugs without violating Federal law") (emphasis added).

> United States v. Fedida, 942 F.Supp.2d 1270, 1275 (M.D. Fla. 2013) (citing portions of

numerous remarks in the Senate as to purpose and intent). Consider also:

> "This can be done legally because *each new analog must go through the procedure required for substances to be put on the controlled substance list* and the underground chemists come up with new analogs faster than the DEA can get the drugs listed." 131 Cong. Rec. S17842-04, 1985 WL 206395 (daily ed. December 18, 1985) (statement of Sen. Hawkins) (emphasis added).
> "Synthetic narcotic analogs can be developed and produced faster than they can be identified and controlled. Even with the emergency scheduling provisions of the Controlled Substances Act, the clandestine labs can always stay beyond the reach of the law with a slightly different compound that is *not yet on the schedule of controlled drugs*." 131 Cong. Rec. S17842-04, 1985 WL 206395 (daily ed. December 18, 1985) (written statement of Senator Chiles, printed in the record) (emphasis added).

Statements made by members of Congress in the House of Representatives are consistent with those in the Senate:

> Even with the emergency scheduling provisions of the Controlled Substances Act, clandestine labs can always stay beyond the reach of the law with a slightly different compound that is *not yet on the schedule of controlled substances*. 131 Cong. Rec. E1320-01, 1985 WL 705499 (daily ed. Apr. 3, 1985) (statement of Rep. Rangel). (emphasis added).

There is nothing ambiguous about "[E]ach new analog *must* go through the procedure required for substances to be put on the controlled substance list," nor is that intent permissive (emphasis added). These statements evidence a clear congressional intent that newly identified substances *would* then be scheduled as controlled substances, once discovered.

The clear conclusion to be drawn from the statutory framework of the CSA and the Analogue Act together, as well as these statements, is that Congress did not fail to create a separate procedural scheme for analogues because they intended for there to be none whatsoever. Rather, it is because Congress clearly envisioned that once the DEA had identified an analogue, *it would then move to schedule it as required* through the procedures outlined in – and clearly mandated by – the CSA and Subchapter 1. This conclusion provides a far better explanation as to why no list of analogues was ever required of the DEA – not because the DEA was explicitly permitted to hide the ball, but because analogues *were not meant to be kept secret indefinitely*. They were meant to be moved for scheduling *upon discovery*, which renders maintaining a separate list of analogues entirely unnecessary.

This conclusion naturally leads to the question of timing, which is relevant to this case in two respects: statutorily, and constitutionally. The Defendant's position is that the DEA should schedule substances as a matter of constitutional notice, and the Government's position is that the DEA has no such obligation. As a result, neither party has presented any specific arguments

as to timing. However, the preceding discussion of Congressional intent makes clear that despite the lack of a specific amount of time, the operation of the Analogue Act was intended to be temporary; that much is certain. Congress clearly envisioned that the Act would operate just until the DEA published notice in the Federal Register initiating temporary scheduling for the new substance. However, the statute provides no specific directives on how soon the DEA should do so. Indeed, this may very well be because it was generally assumed that the DEA would *not* delay in doing so. See Touby, 500 U.S. at 164 (expressing the assumption that scheduling procedures "presumably" would commence in accordance with the directives of the statute).

On this point, it is worth noting that presumptive ("field") testing can – as the name implies – be done in the field, at the moment of seizure, and is completed almost immediately. Further, confirmatory testing of seized substances via gas chromatography/mass spectrometry (commonly referred to as "GC/MassSpec") can be completed on average between ten (10) and thirty (30) minutes. In fact, the DEA monograph provided by the Government indicates that GC/MassSpec analysis of MAM-2201 spent about twenty-six (26) minutes were reaching and maintaining temperature, and about twenty-two (22.630) minutes were for retention (ECF No. 91-1 at 3).

Law enforcement is therefore capable of knowing *very* soon the precise chemical composition of a substance, and therefore, whether a substance is physically substantially similar to a controlled substance, rendering it an analogue. Further, "Section 811(h) provides for a summary method to place drugs on Schedule I without hearings or findings," and essentially dispenses with virtually every other scheduling requirement in 811(a). United States v. Spain, 825 F.2d 1426. "No scientific factors [are] involved nor are outside views provided for on any subject. The ultimate conclusion is as to 'public safety.'" Id. at 1428. Thus, apparently, the DEA

can initiate temporary scheduling armed with little more than a GC/Mass Spec printout and a concern for public safety. With § 811(h)'s temporary scheduling procedures, it would appear that the only delay the DEA faces in publishing notice of intent to temporarily schedule, rendering analogues subject to prosecution, are delays entirely within it's – and law enforcement's - own control.

Here, the question of timing need not be resolved precisely, as the length of time MAM-2201 has languished unscheduled since discovery – nearly five years – is *clearly* in violation of what Congress envisioned, and of any reasonable expectation. Especially given the relative speed at which the process can be initiated, and the length of time since discovery, there is no apparent reason that would excuse the failure.

It has also been suggested that the DEA could not practically initiate scheduling for all of the substances they encounter. "Given the creativity of amateur chemists, such a list might well be impossible to compile." United States v. Hoftstatter, 8 F.3d 316, 322 (6th Cir. 1993) See also United States v. McFadden, 753 F.3d 432, 441 (4th Cir. 2014) (reversed on other grounds) (citing Hoftstatter in stating "there is genuine potential that the creation of such substances could outpace any efforts by authorities to identify and catalog them"). That claim is often summarily made in reference to the Analogue Act, but unaccompanied by supporting evidence.

In reality, the DEA has managed to move for the scheduling at least *fifty-five* (55) new substances since April 2012,[3] at least fifteen (15) of which were synthetic cannabinoids – the same class of substance as MAM-2201 (ECF No. 115-3 – 115-14). There is no evidence before the undersigned to suggest that the DEA is in fact overwhelmed with a deluge of novel substances, the sheer volume of which significantly impedes their ability to schedule. The

---

[3] DEA Scheduling Actions – Chronological Order.
https://www.deadiversion.usdoj.gov/schedules/orangebook/b_sched_chron.pdf (last visited December 7, 2016).

scheduling history rather suggests that the DEA regularly schedules the substances they desire to schedule. Any such potential the designer drug problem may have been feared to pose appears to have gone somewhat unfulfilled. In fact, the vast majority of drug prosecutions are for scheduled controlled substances and prescription drugs; analogue prosecutions are a decided minority.[4] This is no doubt due in part to the fact that abuse of scheduled substances and prescription drugs present a much bigger problem, and in part to the fact that the DEA has moved for the scheduling of numerous substances that were once analogues as they should have. In fact, on occasions when courts have dismissed indictments for certain substances, the DEA's response has been to simply schedule it, resolving the issue in the manner in which it was always authorized and able. See Forbes 805 F.Supp. 232. (D. Colo. 1992).

Lastly, and most importantly, the DEA does in fact maintain an internal list of analogues, as shown by internal emails submitted by the Defendant in this case – fairly compelling proof that such a list is not impossible to compile. These issues of statutory mandate and Congressional intent appear all that is necessary to resolve the case before the Court. However, with regard to the second relevant aspect of timing – under what circumstances the failure to schedule undermines constitutional notice – the undersigned makes the following observations.

Courts have held that the Analogue Act permits investigation at any time because otherwise, "if notice and hearing were required [for investigation] every time a new substance is targeted as a potential analogue, the statute would serve no purpose whatsoever." United States v. Roberts, 2001 WL 1602123 (S.D. N.Y. 2001). The undersigned agrees. The key aspect of this holding, however, is that it applied specifically to *investigation*. Id. It does not automatically follow that *prosecution* under the Analogue Act is authorized at any time, under any

---

[4] In the Northern District, there were over 270 controlled substance cases filed in 2016 so far. As far as the undersigned is aware, all but one of those cases – Mr. Barker's – are for controlled substances, not analogues.

circumstances. Indeed, Congress did not appear to envision that possibility beyond the initial period when the DEA encounters a substance of first impression. The undersigned believes that the circumstances and timing in this case are not only statutorily unjustified, but also operate to undermine constitutional notice.

### 3. Circumstances Undermining Constitutional Notice

Though Defendant's arguments pertaining to constitutional notice are well taken, unlike the recommended holding, this issue *has* been addressed by prior precedent. However, some observations are in order. Most notably, McFadden's holding was narrow and limited to jury instructions regarding the intent prong; as Chief Justice Roberts observed, "[t]he Court's statements on this issue are not necessary to its conclusion . . . [and] should therefore *not be regarded as controlling* if the issue arises in a future case." 135 S.Ct. at 2308 (emphasis added).

On the other hand, while Klecker's holding that the Analogue Act is not unconstitutionally vague was articulated specifically to a different substance, "Foxy," Klecker's rationale was based on factors that would appear to apply to any substance equally, including that the "intent requirement alone tends to defeat any vagueness challenge based on the potential for arbitrary enforcement." 348 F.3d 69 (4th Cir. 2003). However, the Klecker court also observed that preventing arbitrary enforcement was the more important aspect of the vagueness doctrine with regard to a *facial* challenge, 348 F.3d at 71 (citing Kolender v. Lawson), and – most importantly – that "[t]he question of whether the statute provides adequate notice is closer." Id. It is thus not completely clear that consideration of constitutional notice in this case would be entirely precluded by Klecker, because the circumstances are distinguishable. That is, the undersigned considers rather under what circumstances delays in scheduling and evidence to the

contrary can operate to *undermine* constitutional notice that, assuming for the sake of argument and precedent, may have *initially* been sufficient at one time.[5]

Fifth Amendment due process requires that a statute must "define the criminal offense 1) with sufficient definiteness that ordinary people can understand what conduct is prohibited and 2) in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357, 102 S.Ct. 1855, 75 L.Ed.2d 903 (1983). In the context of a facial challenge, the second prong – preventing arbitrary enforcement – is "the more important aspect of the vagueness doctrine." Klecker, 438 F.3d. As noted, Defendant's challenge is considered only as applied here, *not* as facial. It is therefore the first prong, regarding adequate notice, with which the undersigned is most concerned as applied to MAM-2201 and the Defendants in this case.[6]

The Government argues that the DEA has no obligation to maintain a list of analogues under United States v. McFadden, 753 F.3d 432 (4th Cir. 2014) (overturned on other grounds). The Fourth Circuit "decline[d] to extend [the] holding in Klecker by imposing a constitutional notice requirement that the Act contain a list of prohibited [analogue] substances" (adopting the view in United States v. Fisher, 289 F.3d 1337 n.11 (11th Cir. 2002) that "[n]o list of controlled substance analogues is necessary"). As already addressed at length, the undersigned believes the DEA is not obligated to maintain a list of analogues, albeit on separate statutory grounds – because Congress intended that analogues be moved for scheduling upon discovery; therefore, adherence to the mandates of the CSA renders a separate list of analogues unnecessary. Were

---

[5] The Klecker Court determined that the term "substantially similar" is not unconstitutionally vague, and that "the intent requirement along tends to defeat any vagueness challenged based on the potential for arbitrary enforcement." 348 F.3d 69, 71.

[6] With regard to MAM-2201 specifically, some arguments are dispensed with at the outset. The Government's assertion that "some states have begun to schedule MAM-2201" has no relevance to this case. West Virginia has not criminalized MAM-2201, so any bearing on notice in this instance is unclear. Even if it had, this action is brought under federal law, to which the laws of "some states" do not apply in this instance.

that not the case, however, the DEA's Office of Diversion Control, Drug and Chemical

Evaluation Section (ODE) *does* maintain an internal list of analogues (ECF No. 119 at 14).

Given that precisely such a list apparently already exists, any claims that the DEA could not

feasibly create or maintain one is are without merit. Therefore, it is truly difficult to imagine why

such notice could not be easily provided, and further why such notice has not been provided. In

this respect, Defendant's arguments regarding notice generally are well taken.

As the Government pointed out at the motion hearing, Forbes is distinguished from

Klecker, in part due to the perceived lack of scienter (since judicially read into the act as

curative), but also because Forbes could fairly interpret the DEA and the Government's actions

as rebutting the presumption that it might treat AET as an analogue, thus *not* subjecting it to

control. United States v. Forbes, 806 F.Supp. 232 (D. Colo. 1992). Yet, it appears that the

circumstances in this case are – though not identical – *most* analogous to Forbes of any case,

certainly more so than Klecker. In Forbes, the defendant was prosecuted after two years had

passed, and uncertainty as to whether the substance was properly an analogue was expressed.

The scienter distinction notwithstanding, the undersigned believes there is an important parallel

to Forbes's rationale here. That is, like in Forbes, it is not unreasonable for a citizen to interpret

the DEA's actions as indicating they did *not* intend to treat it as controlled when 1) the DEA has

known of MAM-2201's chemical composition for nearly five years; 2) in that time, it has

regularly scheduled numerous other synthetic cannabinoids; and 3) to this day, it has failed to

initiate any scheduling procedures whatsoever for MAM-2201.

Evidence shows that in April 2012, the DEA was aware of MAM-2201, knew its

chemical composition, determined it to be structurally similar to a controlled substance, and

emails reported that functional evaluation was underway at that time. There is no additional

evidence on this point before the Court, and so any guesses as to *why* MAM-2201 has languished unscheduled for nearly five years would be speculative. However, there are a number of plausible explanations. It is possible that it was a case of mere oversight. It is also possible that results of the functional evaluation underway in 2012 did *not* support MAM-2201's status as an analogue, and it therefore did not warrant scheduling. With no evidence to dispel that possibility, this alone cautions against permitting prosecution in this case.

Whatever the reason, these facts taken together constitute substantial evidence that the DEA did *not* intend to treat MAM-2201 as controlled, and operate to undermine any constitutionally adequate notice the Analogue Act may have initially provided for that substance specifically. The facts of this particular case compel the conclusion that constitutional notice was no longer satisfied with respect to MAM-2201, given substantial evidence to the contrary, and would also warrant dismissal even if violation of the procedural requirements did not.

### 4. Policy Considerations

Lastly, beyond what has already been addressed, there are significant and compelling Policy considerations that caution strongly against upholding indictments for analogues when the DEA has not followed scheduling mandates timely.

### A. The DEA's Failure to Timely Schedule Imposes an Unnecessary Burden on the Legal System

The Analogue Act has been contentious since its inception, garnering continued challenges to the sufficiency of the term "substantially similar" even today, *thirty years* after it was first enacted. Courts have struggled continuously with what "substantially similar" means both in terms of physical similarity and functional similarity. Though physical similarity is often

the easier determination of the two, and in some cases the determination has been a simple as comparing a diagram of the two substances' structures, it is not always such a simple task.

United States v. Hodge cited the American Heritage Dictionary's definition of a chemical analogue as "defining "analogue" in chemistry as "[a] structural derivative of a parent compound that often differs from it by a single element." 321 F.3d 429, 436 (3rd Cir. 2003). Yet, experts have disagreed even on such a seemingly basic question as physical similarity based on factors such as "weight, shape, and the relative amounts of different types of atoms," Klecker, 348 F.3d at 72; whether the "substitution of a tetramethylcyclopropyl moiety in place of the napthyl moiety is a significant change in chemical structure," Fedida, 942 F.Supp.2d at 1279; whether variations between the two substances on a shared "core chemical structure" are "insignificant," "inconsequential," or "peripheral," McFadden, 753 F.3d at 439-40; an analogue being a "primary amine" when the controlled substance is a "tertiary amine," Forbes, 806 F.Supp at 234; and, just in case the point is not yet obvious, this relating of expert testimony from United States v. Roberts:

> At the June 17, 2001 hearing, the two defendants and the Government presented expert witnesses who testified about the chemical structures of 1,4–butanediol and GHB. The Defense called two witnesses, both credible and qualified academics with extensive credentials in organic chemistry. Toback called Dr. Boyd Haley, Chairman and Professor of the chemistry department at the University of Kentucky, with a joint appointment in the College of Pharmacy. Roberts called Dr. David Schuster, Director of Graduate Studies in Chemistry at New York University and former visiting professor at Yale University. Schuster is the author of over 200 publications and holder of two patents. The Government called Dr. Tom DiBerardino, an employee of the DEA's Drug and Chemical Evaluation Section (a branch of the Office of Diversion Control) with a PhD in polymer chemistry.
> Each of the three experts agreed that the two substances in question contain a different "functional group": 1,4–butanediol has an alcohol major functional group while GHB has a carboxylic acid major functional group. That is, one is commonly classified as an alcohol or diol, and one is an acid. Those functional groups impart physical properties to the chemicals, such as acidity levels, melting and boiling points, and odors. All three also agreed that 1,4–butanediol can be converted into GHB within the human body upon ingestion.

Both of the defendants' experts concluded that 1,4–butanediol and GHB are not substantially similar in chemical structure, and that the majority of experts in their field would agree with them. Both based their conclusions upon a number of criteria, including the fact that GHB is an acid and 1,4–butanediol is generally classified as an alcohol. They testified that the two substances would be classified in different parts of an organic chemistry book, which is organized by functional group, and that a student who stated on a college exam that GHB and 1,4–butanediol were similar in chemical structure would indeed fail such an exam.

Dr. Haley related that GHB has a negative charge at one end of its structure, and a positive charge at the other, so that the ends necessarily attract, thereby effectively rendering GHB an unstable molecule. In contrast, 1,4–butanediol does not have such properties and would remain linear. Likewise, Dr. Schuster stated that when illustrated three dimensionally, GHB folded over upon itself, and would not appear static because of its instability. Both experts testified that results from a nuclear magnetic resonance (NMR) spectometer, routinely used by chemists to analyze the nature of the functional groups present, documents the structural dissimilarity of 1,4–butanediol and GHB.

The Government's witness, a DEA employee with a degree in polymer (rather than organic) chemistry, disputed the conclusions drawn by Dr. Haley and Dr. Schuster that the two chemicals were not structurally similar. Dr. DiBernardino's principal disagreement was the importance placed on the functional group in assessing chemical structure. He testified that while comparing functional groups might illustrate different properties and reactivity of the chemical substances, such comparisons were not relevant in determining structural differences.

Following this, the <u>Roberts</u> court found that the Analogue Act was unconstitutionally vague as applied to 1,4 Butanediol because:

Applying the constitutional standards stated above, a review of the facts reveals that there could not have been adequate notice to the defendants that 1,4–butanediol qualifies as an analogue of GHB. The definition of "controlled substance analogue" is a scientific definition, meaning that it is proper to explain its terms by reference to the art or science to which they are applicable. *See Corning Glass Works v. Brennan,* 417 U.S. 188, 201, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974). An acceptance of the meaning of terms in the scientific community would therefore inform the vagueness inquiry. *See United States v. Jackson,* 968 F.2d at 161–63.

In the case of the substances in question, it is readily apparent from the June 17, 2002 hearing that there is no scientific consensus whether 1,4–butanediol has a chemical structure substantially similar to GHB. Both of the defendants' experts, academic leaders in the field of organic chemistry, testified that in fact the substances were dissimilar in chemical structure, as evidenced by their functional groups, the instability of GHB as opposed to 1,4–butanediol, and a comparison of NMR spectograms. The government's expert, of course, disagreed, indicating that an ordinary person would have no legitimate, reasonable opportunity to know whether 1,4–butanediol meets the analogue definition.

*4 While the Government is correct that a statute should not be void for vagueness if it "conveys sufficiently definite warning as to the proscribed conduct when measured by

common understanding and practices," *United States v. Petrillo,* 332 U.S. 1, 9, 67 S.Ct. 1538, 91 L.Ed. 1877 (1947), it cannot be said, as the Government argues, that the phrase "substantially similar to the chemical structure of a controlled substance" is so familiar that a reasonable layperson could determine what it means as applied to the substances in question. The Government, based on its expert's testimony, contends that "chemical structure" is a very narrow term which exists separate and apart from a substance's functional group and which should not be confused with a chemical's "properties." However, this very argument demonstrates that the scientific community cannot even agree on the proper methodology used to determine structural similarity. The DEA employee emphasized the atomic composition of the two substances as illustrated in their molecular chains, relying primarily on two-dimensional charts. But this approach was deemed insufficient by the organic chemists, who stressed that, when illustrated three-dimensionally, GHB would fold over upon itself with little stability and thus manifest a completely different chemical structure than 1,4–butanediol.

It is for this reason that the Government's reliance on *United States v. McKinney,* 79 F.3d 105 (8th Cir.1996), is misplaced. In *McKinney,* the court found that the analogue statute was not void for vagueness as applied to the drugs aminorex and phenethylamine. The court held that "a reasonable lay person could ... have examined a chemical chart and intelligently decided for himself or herself, by comparing their chemical diagrams, whether the chemical structure of the two substances were substantially similar." *Id.* at 108. Here, even if the diagrams of 1,4–butanediol and GHB were made available to a layperson, the lack of consensus by experts in the field as to the import of those diagrams demonstrates that they could not provide such a person with the degree of notice sufficient to know whether their conduct would be prohibited by the Analogue Statute. *See United States v. Forbes,* 806 F.Supp. 232, 237–38 (D.Colo.1992) (holding Analogue Statute vague as applied to AET where the "scientific community cannot even agree on a methodology to use to determine structural similarity" and "criminal culpability will turn solely on a *'battle of the experts' at trial."*).

2002 WL 31014834, No. 01CR410 (S.D. N.Y 2002) judgment vacated by United States v.

Roberts, 363 F.3d 118 (2nd Cir. 2005) (holding instead that "because 1,4-butanediol both (a)

differs from gamma hydroxybutyric acid ("GHB") . . . by only two atoms and (b) converts into

GHB upon ingestion, it is sufficiently clear that 1,4-butanediol is "substantially similar [in]

chemical structure" to GHB"). Or take the Fedida Court's analysis, 842 F.Supp. at 1278-81:

Here, the Government contends that the chemical structures of UR–144 and XLR–11 are substantially similar to the chemical structure of JWH–18. The Government reaches this conclusion based on an analysis of the two dimensional structures of these compounds, which are as follows: *1278 (Doc. 33–1; Doc. 37–2, Boos Decl. ¶¶ 9, 19.)

As described by the Government's expert, each of these substances has an indole core, which consists of a benzene ring fused to a nitrogen-containing pyrrole ring. (Boos Decl. ¶¶ 8, 17.) Each substance also has two substitutions to the indole core. The first

substitution takes place at the nitrogen in the indole core, which is also referred to as the "1–position." In all three substances, the substitution at the 1–position is a 5–carbon pentyl chain. 5 The second substitution is located at a carbon atom in the indole core which is located two positions away counterclockwise from the nitrogen. This is referred to as the "3–position." UR–144, XLR–11, and JWH–18 differ primarily with regard to the functional group that occupies the 3– position of the indole core. The 3–position substituent in JWH–18 is a naphthyl moiety, which is a fused pair of benzene rings, attached to the indole core by a carbonyl group. The 3–position substituents in UR–144 and XLR–11, however, are tetramethylcyclopropyl moieties, which consist (in part) of three carbon atoms that are linked together in a triangular ring, that are also attached to the indole core by a carbonyl group. Thus, UR–144, XLR– 11 (except as noted elsewhere), and JWH–18 share the following chemical structure: (Id. ¶¶ 12, 21.) The R in the figure represents either naphthyl or tetramethylcyclopropyl, depending upon the substance. The Government argues that the replacement of the naphthyl moiety in JWH–*1279 18 with the tetramethylcyclopropyl moiety present in UR–144 and XLR–11 is of minor significance. (See id. ¶¶ 14, 23.) As such, the Government and its experts conclude that the chemical structures of UR–144 and XLR–11 are substantially similar to the chemical structure of JWH–18. (Id. ¶¶ 24–26.)

Defendant argues that the substitution of a tetramethylcyclopropyl moiety in place of the naphthyl moiety is a significant change in chemical structure. (Doc. 33, pp. 5–7.) Dr. Wayne Morris, Defendant's expert witness, opined that a naphthyl moiety has several properties that are different from a tetramethylcyclopropyl moiety, the most significant of which is naphthyl is an aromatic ring system while tetramethylcyclopropyl is not. (Doc. 33–2, ¶¶ 11–12.) Aromatic ring systems have unique properties arising from their delocalized electrons and shape. (Id. ¶ 12.)

Defendant contends that the carbon atoms in an aromatic ring each "share" one electron with the other carbon atoms in the ring, which increases the stability of aromatic rings and causes them to undergo chemical and biochemical reactions differently than other chemical structures. (Id. ¶¶ 12–14.) Further, in three-dimensional space, aromatic rings form long, flat structures, allowing them to interact in special ways with other aromatic ring-containing compounds. (Hr'g Tr. 57:22–59:10.) The tetramethylcyclopropyl moiety in UR–144 and XLR–11, on the other hand, has a small, compact, and ball-like structure that does not share electrons or interact with other compounds in the same manner as aromatic rings. (Doc. 33–2, ¶¶ 12, 14.)

[5] Upon consideration, the Court is not persuaded that the statute is impermissibly vague as applied to UR–144 and XLR–11. While Defendant posits several technical and detailed reasons why the substitutions present in these compounds are substantial changes to their chemical structures as compared to JWH–18, the Government need not overcome the critical eye of chemists and other experts. 6 Rather, it must merely show that ordinary people would be able to determine whether UR–144 and XLR–11 are proscribed analogues of JWH–18. See United States v. Carlson, 87 F.3d 440, 443–44 (11th Cir.1996); see also United States v. Brown, 279 F.Supp.2d 1238, 1241 (S.D.Ala.2003). The substances at issue in this case share the same core chemical structure with JWH–18. The only meaningful difference between these compounds is a replacement found within the 3–position substituent. (See, e.g., Doc. 40–2, Harris Aff. ¶¶ 8, 10.) A reasonable layperson who examines the two-dimensional drawings of the chemical structures of

UR–144, XLR–11, and JWH–18 could plausibly conclude that such substances are substantially similar. This is all that is required.

These lengthy excerpts are not necessary to the conclusion here, as it does not depend on the sufficiency of "substantially similar," but they are provided to illustrate a different significant point: this is the task that courts and juries are saddled with by the Analogue Act.

When dealing with a substance of first impression – that is, when the DEA has not had an opportunity to initiate temporary scheduling procedures – this is a complicated but necessary undertaking that is properly the task of the courts. When the DEA schedules new substances timely as it becomes aware of them, this highly technical determination is properly made by person who is both assigned this job, and possesses the necessary expertise to make the determination - the Secretary, in reviewing the scheduling order. However, when the DEA has had ample time to initiate scheduling procedures and has not done so, the result is that this determination is removed from the hands of the Secretary, where it properly belongs – who is *mandated* to make such decisions – and given instead to lay courts (in constitutional challenges) and to lay juries (at trial) to make what sense of it they can, with differing results. The wisdom of doing so on any occasion when it is not necessary (e.g., when the substance is one the DEA is fully aware of and has had adequate time to schedule) speaks for itself.

It creates difficulty for the Government as well. Here, through no fault of the Government, the DEA's failure to timely schedule effectively converted what would have undoubtedly been a simple and quickly-resolved controlled substance case into a complex and protracted analogue prosecution involving numerous pretrial motions and hearings, and which has already involved expert witnesses to some extent.

Relatedly, defendants have raised the issue, as Mr. Barker does here, that the issue of "substantial similarity" has no agreed-upon criteria or acceptance in the field of chemistry. While

this issue is not properly decided in a pretrial motion, it is nonetheless a significant issue for trial.

That is, when the Government can present evidence of a defendant's knowledge of functional

similarity at trial, such evidence may render any argument on that issue by expert witnesses

unnecessary. However, the <u>Fedida</u> court noted that when the Government instead seeks to have

expert witnesses testify to functional similarity, that the Government's expert witness testimony

in that case appeared to be significantly lacking with respect to <u>Daubert</u> criteria:

> At the hearing, the Government's experts opined that UR–144 and XLR–11 have a
> stimulant, depressant, or hallucinogenic effect on the central nervous system that is
> substantially similar to or greater than the stimulant, depressant, or hallucinogenic effect
> on the central nervous system of JWH–18. However, these opinions were based on little
> more than the experts' review of the available scientific literature, which was limited to a
> few articles containing reports of UR–144's binding affinity to cannabinoid receptors.
> (Hr'g Tr. 233:10–17 (identifying one scientific report describing the binding affinity of
> UR–144), 234:1–11 (acknowledging that XLR–11 does not appear in the scientific
> literature), 238:5–11 (referring again to a single scientific report), 240:23–241:9
> (acknowledging the absence of studies on XLR–11's pharmacologic effect), 264:19–22
> (relying generally on "examples in our literature" and "structure activity relationships" to
> predict "how XLR–11 would behave"), 294:20–295:3 (relying on the scientific literature
> and "knowledge drawn from structure activity relationships"), 295:16–296:18 (same).)
> The opinions of the Government's experts were lacking in other ways, as well. They had
> not been subjected to peer review or publication. There was no evidence concerning the
> known or potential error rates of the experts' methodology—which amounted to little
> more than the deduction of a working hypothesis supported by a general knowledge of
> chemistry and biochemistry —or whether the experts' opinions and methodologies were
> generally accepted in the scientific community. The Court is not inclined to permit an
> expert to testify to a jury where the basis of his opinions rests only on broad scientific
> principles. *See, e.g., McCain v. Metabolife Int'l, Inc.,* 401 F.3d 1233, 1240–44 (11th
> Cir.2005) (rejecting as too speculative the opinions of an expert witness in a toxic tort
> case that were based in large part on the "broad principles of pharmacology").

942 F.Supp.2d 1270, 1281 (2013). Defendant is thus not precluded from arguing this issue at

trial, if and when the case comes to that.

### B. The DEA's Failure to Timely Schedule Encourages Misleading Information Relevant to Notice to be Disseminated

The Government's asserts that "anyone with internet access has had either constructive or actual

notice of both the chemical properties and legal status of MAM2201," citing some websites that

so state (ECF. No. 91 at 4). Whether any particular defendant had actual notice is likewise an issue of fact for trial. However, as to notice generally provided with respect to MAM-2201, at a motion hearing on August 4, 2016, defense counsel advised the Court that he likewise found and provided to the Government five (5) websites claiming the opposite – that MAM-2201 was "legal." Such statements are easy to find:

> "It is quite easy to buy MAM-2201 from research chemical suppliers and the drug is not strongly regulated. In some US states, it is illegal but such states, MAM-2201 is often still sold at small convenience stores in prominent packaging. It is currently not listed as a controlled substance in the US and one can buy MAM-2201 unless the specific state has a ban. Only New Zealand has a nationwide ban on the drug."
> For your use-legalities of MAM-2201
> The import and sale of MAM-2001 have been banned in the British Isles, but it is still currently legal to buy MAM-2201 in the Netherlands. The use of 6APBD is not specifically banned in the United States. In the US, it is classified as "unscheduled". This is interpreted to mean that it is not specifically listed (on a "schedule") as an illegal substance. The United States Food and Drug Administration, or FDA does call it "unfit" for consumption by humans. But in the USA, some chemical fertilizers exist which USFDA and the US Dept. of Agriculture continue to allow to be grow cattle feed for steers that American citizens eat as steak and hamburger.[7]

Which notice one receives - either that MAM-2201 is considered an analogue of a controlled substance, or that it is "legal" or "not yet scheduled in the United States" – is thus entirely dependent upon which website one happens to visit.

The larger policy issue here is that when the DEA fails to timely move an analogue for scheduling, it effectively enables internet retailers to *truthfully* state that substances are "not scheduled" in the United States. While technically accurate, this is wildly misleading to any individual without significant legal acumen, as it implies that purchase and possession is entirely legal.

## C. The DEA's Failure to Timely Schedule Deprives Defendants of Due Process

It is not disputed that the DEA may *investigate* any substance at any time, regardless of

---

[7] RC Chemical, LLC – MAM-2201. http://rc-chemical.com/goods/mam-2201/ (last visited December 11, 2016).

whether it has initiated scheduling procedures, to determine whether it poses a threat warranting control. It may seize a substance for analysis in furtherance of that investigation. However, at the time a determination is made that the seized substance is considered to be an analogue and prosecution is initiated, the undersigned believes that the DEA *is* then obligated to initiate scheduling procedures, not only as a matter of statutory mandate, but also as a matter of due process – not just for the first defendant prosecuted under the Analogue Act, but for subsequent defendants, too.

That is, publication in the Federal Register and an initiation of the scheduling procedures provides two very important things: first, it provides any defendants who *aren't* the "underground chemists" targeted by the Analogue Act and who *don't* have a background in advanced chemistry – that is, "persons of average intelligence" – notice in terms they can understand, allowing them to tailor their behavior to comport with the law and avoid the substance from that point on. Second, and the bigger picture, is that initiating scheduling procedures also provides due process afforded to all subsequent defendants, because § 811(h)(6) allows "an individual facing criminal charges . . . [to bring] a challenge to a temporary scheduling order as a defense to prosecution." <u>Touby</u>, 500 U.S. at 168, 111 S.Ct at 1758. A defendant can hardly bring a challenge to a temporary scheduling order if there is none – if it is withheld indefinitely by the DEA. Therefore, the DEA's failure to initiate scheduling timely creates unnecessary concerns for both notice and due process.

As to <u>Johnson</u>, no holding with respect to that case is required here. However, there is enough of a parallel warranting concern and mention:

> "Two features of the residual clause conspire to make it unconstitutionally vague. By tying the judicial assessment of risk to a judicially imagined "ordinary case" of a crime rather than to real-world facts or statutory elements, the clause leaves grave uncertainty

about how to estimate the risk posed by a crime. See James, supra, at 211, 127 S.Ct. 1586. At the same time, the residual clause leaves uncertainty about how much risk it takes for a crime to qualify as a violent felony. Taken together, these uncertainties produce more unpredictability and arbitrariness than the Due Process Clause tolerates."

135 S.Ct. at 2554. It is not a precisely analogous situation, since here "substantially similar," problematic as it can be, is a statutory element. But it appears that the end result is substantially similar. Here, the Analogue Act mandates that penalties for possession of a Schedule I controlled substance – the harshest drug penalties – be given for possession of a substance that may, or may not, actually fit the criteria of a Schedule I substance. Because that determination cannot be made until scheduling procedures are initiated, it is conceivable that a defendant could receive a Schedule I penalty for a substance that later is found to meet only Schedule II criteria. In fact, here, *any* analogue is assumed to warrant Schedule I penalties, and yet, alternatively, when the DEA fails to initiate scheduling procedures at all, for a substance that never receives any proper evaluation. In that respect, defendants prosecuted under the Analogue Act do not even receive the benefit of a categorization, since one is just assumed.

## VI.  Conclusion

As a matter of clear statutory mandate and congressional intent, the undersigned believes the DEA must undertake scheduling procedures once an analogue has been identified. Adherence to the commands of the statute, including the CSA, is required when applying the Analogue Act. McFadden, 135 S.Ct. at 2301 (reversing a "conclusion [that] is inconsistent with the text and structure of the statute"). When the DEA fails to follow the "exact statutory procedure" mandated by the CSA, the proper remedy is dismissal of the indictment. United States v. Caudle, 828 F.2d 1111, 1112 (1987).[8] Cf. Spain, 825 F.2d at 1429 (reversing conviction as remedy for

---

[8] Some courts upheld prosecution for MDMA under the Analogue Act following the DEA's failed scheduling attempt for MDMA, wherein prosecution under the CSA could not stand. See e.g. United States v. Desurra, 865 F.2d

failure to follow directives of statute; subsequently reversed on other grounds). Here, the DEA's failure to comply with this clear statutory mandate warrants dismissal of the indictment.

Indeed, though most courts have upheld indictments for analogues, they have done so on different grounds, and under different factual scenarios. The recommended holding in this case is thus easily distinguished from any precedential decision (or, quite possibly, all decisions) regarding the Analogue Act. Even if it was not, it is well settled that in our hierarchy of laws, in the case of a conflict between statute and case law, a statute prevails. Here, the statute's directives and Congress' intent are clear.

## VII. Recommendation

Accordingly, the undersigned recommends that all Counts of the Indictment against Defendants Eric Barker, Randall Barker, and Megan Dunigan be **DISMISSED** for the reasons stated above. Because Counts Three through Eleven for distribution are dismissed, Counts One and Two – for conspiracy and maintaining a drug involved premises – cannot stand independent of the remaining counts and must also be dismissed.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the Report and Recommendation set

---

651 (5th Cir. 1989), United States v. Raymer, 941 F.2d 1031 (10th Cir. 1991), United States v. Franz, 818 F.Supp. 1478, 1481 (M.D. Fla. 1993). Those cases are not analogous to the current situation with MAM-2201, because here, failed scheduling *attempt* is distinct from a failure to ever initiate any scheduling procedures.

More specifically, the notice in such cases is far more sufficient, because regardless of the eventual outcome of the scheduling process, the DEA has at minimum unequivocally signaled their intent to treat the substance as controlled. "The DEA's efforts [to schedule MDMA as a controlled substance] if anything, gave the defendants additional notice that MDMA was an illicit drug." United States v. Desurra, 865 F.2d 651, 653 (5th Cir. 1989). Further, unless the substance at issue is *not* a substance of first impression, and circumstances such as those here exist to seriously undermine notice, this argument would be inapplicable.

forth above will result in waiver of the right to appeal from a judgment of this Court based upon such report and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

It is so **ORDERED.**

The Court directs the Clerk to transmit copies of this Report and Recommendation to counsel of record.

Dated: December 12, 2016.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE